MarcavagevCityofPhiladelphia,etal. Is it Mr. Hoppe? Am I pronouncing your name correctly? Hoppe, Your Honor. Hoppe. Thank you. Good morning, Your Honors. May it please the Court. My name is Ted Hoppe, and I represent the plaintiff appellant in this case, Mr. Michael Marcavage. At this time, I'd like to reserve three minutes of my time for rebuttal. Your Honors, in this case, the defendants targeted Mr. Marcavage because of his unpopular message, creating three constitutional problems. First, they unlawfully restricted his free speech activities. Second, they enforced an unlawful heckler's veto. And third, they violated his right to equal protection of the law. This case is before the Court from a grant of summary judgment by the trial court in favor of the defendants. Your Honors, this case involves the right of individuals to engage in unpopular speech on the public streets and sidewalks. It's well established that the public streets and sidewalks have been held out as a traditional public forum, open for the open expression of all ideas, including unpopular ones. Mr. Hoppe, with respect to the First Amendment issues, how is this case different than our decision in Startzel? Excuse me. Thank you, Your Honor. In Startzel, Startzel involved is different in several ways. First of all, the law that the Court laid out in the Startzel decision is very helpful in all First Amendment cases in providing guidance for the rights of individuals to engage in the public streets and sidewalks and to engage in unpopular speech in that public forum. However, factually, it's completely distinguishable. First, that case involved speech that was inside the permitted area of the event. In our particular case, the incidents that we have, with one possible exception, occurred outside of a permitted area. Second, the Third Circuit, in its decision, found that the plaintiffs had acted intentionally to disrupt the event there. And because of that, they found that the police acted not because of the content of the speech that was being conveyed, but rather because of their conduct. Well, there was actual disruption there. The Court found there was actual disruption there, yes. And the Court made, in its opinion, cited to a couple of different factual findings that it made to show that disruption. So yes, ma'am. But do you agree that the First Amendment does not require the police to wait until there is actual disruption? Your Honor, I do agree, yes. I do agree that there are circumstances where the police have the right to act before there's actual violence or act of disruption. Well, how do they know when they can do it and when they can't? Where do you draw that line? Your Honor, that is going to depend on the facts of the case. But that's not the facts that we have here. Well, let's talk for a moment about the Proposition 8 protest. Yes, Your Honor. The police records there in the appendix show there were about 6,000 people present at that event, that 2,500 of those people surrounded Mark Cavage and the Repent America group. I mean, that was a – you have to agree, that was a delicate situation. That was a time bomb, wasn't it? It may or may not have been a time bomb, Your Honor. Do they have to wait to see if it is a time bomb? Well, Your Honor. If the time bomb explodes. Your Honor, as I indicated, I think, yes, there are some circumstances where the police can act proactively. But I think when you're here on a summary judgment case and the standard is that the facts have to be viewed in the light most favorable to the nonmoving party and if there's any issues of material fact and summary judgment should not be granted, then I would submit to Your Honor that whether that was actually a time bomb that justified the proactive response by the police is an issue of material fact that should have been submitted to the trier of fact, not determined on summary judgment. But, Your Honor, if you go back to the issue of – Well, why wouldn't the video evidence be sufficient for the trier of – in this case, for the judge to determine as matter of law? Yes, Your Honor. With the Prop 8 event, there is no video evidence. There is no video evidence. But if you go back to the – But the facts – I don't see you disputing the facts in the record, the ones at 13940 of the appendix. Concerning the Prop 8 event? Yes. I would dispute – The amount of people? I think that's the scenario that was taking place, Your Honor. This is an informant, yes. Sure. But, Your Honor – yes, Your Honor. But, remember, the First Amendment, if it protects anything, protects unpopular speech. And the courts have held that the police have an obligation to control the crowd before they restrict that speech. Look at the Terminella v. Chicago case. That's what the – that was what that case was all about. A crowd that was about to break out in a riot, and the police arrested the preacher because he wouldn't stop speaking. Well, I was specifically interrupted in this situation. Well, thank you, Your Honor. When – if you – Mr. Markiewicz could always communicate with the public his views, couldn't he not? Your Honor, if you look at the two events that took place in 2007 and in 2008 down at Pride Fest at the – at Penn's Landing, for example, in those instances, the facts that are in the record establish that the police singled Mr. Markiewicz out because of the message and viewpoint that he was conveying. Other people were allowed to move about freely, to interact, go wherever they wanted to, talk to whoever they wanted to. The evidence shows that there were people from an animal rights group, for example, that were there allowed to solicit signatures and talk with people, interact one-on-one. There were people from a Ralph Nader group that were soliciting signatures for an election petition. Let me hone in on this, on – you mentioned the Pride Day and the Prop 8 events. He was not prevented from speaking at either event. He was allowed to engage people in conversation at those events. He did his preaching with no interruption. He could display his signs, hand out leaflets, right? Your only argument with reference to those events is that he wasn't allowed to stand exactly where he wanted. No, Your Honor, I respectfully disagree. That's not our only argument. Our argument is, is that Mr. Markavich was singled out for these restrictions because of the content of his message. And as this court – and because of that – Do we have a history of being involved in disorder at these events? Absolutely not, Your Honor. There's – and if there were, again, I would suggest that we're here on summary judgment. And those would have been facts that would have been an issue that should have been submitted to a finder of fact. Your Honor, one of the things that I wanted to point out is, in its decision, the trial court relied – took the start-sell decision and relied solely on the start-sell decision to justify the grant of summary judgment. And in doing so, it made a finding that Mr. Markavich's speech was not restricted because of its viewpoint or content. Again, I submit that those – first of all, that the evidence doesn't support that. When you look at the comments that Mr. – that Defendant Fisher made to Mr. Markavich at the Pride Fest events, where he tells Mr. Markavich specifically, you have an unpopular message. You are the leader of an unpopular group. The crowd does not want to hear your speech, so I have to protect you, and I have to put you over here where I have to protect you. That, to me, Your Honor, I think clearly establishes he was acting because of the content or viewpoint that Mr. Markavich had. That was all obvious, though, was it not? Excuse me, Your Honor? What was added to the situation by making that comment? Excuse me? I'm sorry. Those are obvious facts, are they not? I agree, Your Honor. They are obvious facts, and because of that, they lead to the only conclusion that Defendant Fisher restricted Mr. Markavich's rights because of the viewpoint of the message that he was conveying. It's not funny. I mean, the funny, peculiar thing, Captain Fisher and Mr. Markavich are old buddies here. I mean, Fisher's at every event, and, I mean, they know each other. There's actually, you could characterize them as you wish. I choose to characterize some of them as just kind of banter back and forth. I mean, these are like, I'm not old friends. I don't mean to suggest that, but they know each other. I mean, this is the situation in which you're dealing here. This is not one event, and, you know, the speech, oh, look at those words, this is a pattern, a situation. You know, this is some, they all know exactly what's going on here. Your Honor. And you're looking at it as if, under a microscope, we have to examine this one discreet exchange of words. You do have to examine it with all due respect, Your Honor, with respect to the evidence and the facts that are in the record related to that event. If Captain Fisher was relying on his experience, again, that's an issue that should have been presented to the finder of fact, not decided on summary judgment. What we know from this record is Captain Fisher's statements to Mr. Markavich that I have to put you over here in this free speech zone that I've established it ad hoc, on site, with an arbitrary and unbridled discretion, without any review, without any right to challenge by Mr. Markavich, because I'm concerned how the crowd's going to react to your message. And I submit to Your Honor that that's viewpoint discrimination as a matter of law is unconstitutional. And even if it's not viewpoint discrimination, under the McTiernan v. City of York case, because the officer was imposing a time, place, and manner restriction ad hoc on site, it's subject to a strict scrutiny analysis, not the lower standard that the trial court provided. And second, it's entitled to a strict scrutiny analysis, because it clearly was based on the content of Mr. Markavich's message, shown by Captain Fisher's statement that he was reacting to the crowd's likes or dislikes of the message. And if you look at the foresight case. Did he say to protect him? Because he had to protect Mr. Markavich. That was one reason. But the case law also says, Your Honor, that the police have the obligation to control the crowd. If the police can solely restrict speech, Your Honors, because they're concerned of the safety of the speaker or how the crowd might react, then free speech means nothing, because they can tell anybody. Part of the test is the availability of ample alternative channels. Not under a strict scrutiny analysis, Your Honor, and I submit that it's the strict scrutiny analysis that applies in this particular case for those two reasons. McTernan v. City of York says that when time, place, and manner restrictions are imposed on site by an individual police officer, strict scrutiny applies, not the lower standard. And the trial court applied the lower standard. Second, it was a content-based restriction, because Captain Fisher was imposing the restriction out of concern about the crowd's reaction to the message. And the Forsyth case tells us that when the court, when the officers are responding out of concern about the message that's being conveyed, that, by definition, is a content-based speech. Now, the district court did not rule on the defendant's motion for qualified immunity as to the First Amendment claim, only ruled on the excessive force claim and found in the alternative qualified immunity applied. But wouldn't, wouldn't, can't a good argument be made that it should apply here. I mean, this is, these were unpredictable, volatile situations where you had huge crowds, divisive subject matter, and anything could have happened here. And isn't this precisely the kind of, and this is not just one, two, three, four events, this is a history of these things. Isn't this situation, the whole picture, the kind of situation where one really has to defer to a police officer's discretion to a great extent? Your Honor, I do see my time is up. Is it okay if I answer your question? Go ahead. Your Honor, first of all, I'd like to remind you that Mr. McCabbage was singled out by the officer for this particular restriction, first of all. Second of all, it's really hard for the head of the Civil Affairs Unit of the City of Philadelphia Police Department to argue that he's not familiar with what the First Amendment requires concerning the right to free speech and engage in Also, in the record, there's a training video that, in which Captain Fisher states in that video that he's well aware of what the rights are that people have on the public streets and sidewalks and what the police are supposed to do to protect those rights. We're talking about a pattern. We're talking about these guys are, they've known each other for years because of all of these events. We're not talking about what happens when one guy goes out on the street with a sign. But that doesn't go to qualified immunity, Your Honor. That may go to whether his... We know what the clearly established law is when the one guy goes out there with his banner. But this is a volatile history of events. I would also, if I may... And what is the law... I would also, if I may, just note that you'll see as these things progress that Mr. McCabbage has made an effort to follow the guidance that your court has given him regarding how he should behave in these situations. He took start-sell to heart. He didn't go out and do anything that would result in disruption in the events of Pride Fest. He didn't even try to go inside the festival area. He stayed outside the whole time. He tried to follow, in good faith, the tenets that this court has set out for how he should act, both in this case and in Park Service v. McCabbage and the other cases. It's the city that continues to treat single Mr. McCabbage out for this type of behavior based on his message and the viewpoint that he... How about his ability to communicate and materially disrupted by this conduct by the police? Well, Your Honor, again, my time is up. Is it okay if I answer your question? Please. I think, Your Honor, that it's... First of all, I don't think that that's the question here. The burden is on the city, the government, to prove that it did not interfere with his right to free speech under the appropriate standard. But second of all, I would suggest to you, Your Honor, that Mr. McCabbage's ability to communicate that message was affected because he was singled out and treated differently than other people who were similarly situated to him. How were they similarly situated? They wanted to go... Of the speakers who had the permits. He wasn't Ralph Nader. He wasn't, you know... But he was there seeking to talk with people one-on-one and hand out literature like the people from the Ralph Nader group, like the people from the animal rights group, Your Honor. But they weren't similarly situated. He was in direct opposition to the speakers at these events. They weren't. Sure. They were just holding their sign. But their message was allowed to be conveyed while his wasn't because of the message that he was seeking to convey. Your Honor, I don't agree with you that his message was not allowed to be conveyed. I think you're... Well, his message was restricted. He was restricted in the area that he was allowed to convey his message from while other people who were seeking to convey a message were not. He was told to stand there and say your message. Exactly. Thank you, Your Honor. Thank you very much, Your Honor. Thank you. Good morning. Good morning. May it please the Court, I'm Jane Estvan, and I represent the city and the individual defendants. I'd like to pick up on Judge Barry's point, if I may. The theme of Mr. Hoppe's argument is a repeated refrain that we can't impose a heckler's veto. We can't tell him he can't speak. We have to control the crowd. We have to protect the public. We have to protect Mr. Markavage, and we have to allow him to make his point. Where we part ways is, as Judge Barry points out, in my mind, that's exactly what my clients did. We held back the crowd. We protected Mr. Markavage. We allowed him to speak here with only minimal restrictions. And this occurred amidst huge crowds at permitted gay rights events. And at those events, we protected him so that he could express his point of view with bullhorns, with large signs, by interacting with crowd members, by using an airplane with a banner that stated hopeforhomosexuals.com, directing them to a website, in all kinds of ways. And I would submit that that is not what a heckler's veto is. But that is apparently not enough for Mr. Markavage. What Mr. Markavage claims is a right to a perfect location, a right to go wherever he pleases at these events, without any direction whatsoever on where he can stand. But the Starzl case and the Markavage v. City of Chicago case both established that that's not what he's entitled to. He is not entitled to his preferred location. He is entitled to a location where he can reach his intended audience. And that's what occurred at these events. Well, Starzl, there was a case of actual disruption. I mean, he was blocking access to the vendor booths. He was disrupting. He was yelling, drowning out the events that were going on. That's a different factual setting, isn't it, than the one here? It is, Your Honor. But as Mr. Hoppe agrees, it would make no sense to have a rule that says we have to wait until chaos occurs. We have to wait until there's congestion in the entry area into these festivals in order to act. Wouldn't that be very relevant on qualified immunity? It's relevant on both points. Where I part ways with Mr. Hoppe is he seems to suggest that because there wasn't a melee, that therefore we can't be entitled to summary judgment. And I submit that there are – I'll take each – I think that we have to discuss the events probably in three different categories. So I'll do that. And I'll address first the Pride Day events where we had minimal restrictions and we had a videotape. And as you suggested, Judge Berry, where we have Scott versus Harris, where we have the facts pretty much laid out for us there, this Court can make an assessment that no reasonable jury could have found that our restrictions weren't reasonable. And I would say that as far as line drawing goes, that the standards you can use are things like the minimal nature of our restrictions here. That we – as the Court – and I guess I would invite the Court's attention to the Liberty Bell case, to Markavich versus Park Service, the criminal case. Her opponent says that Mr. Markavich was singled out on a content basis because he was opposed to homosexuality. So we should analyze this case as involving content. What do you say to that? Judge Cuddy, I'd say that he made the exact same point in Starzl and it was rejected. And Starzl goes through the law quite nicely on content neutrality and points out that the standard isn't the identity of the person upon whom we impose the restriction or that we have to take cognizance of the content of his speech. The question under content neutrality is whether we've displayed – is whether we've – there's evidence that we acted out of disagreement with his speech as opposed to acting for the reasons that we stated, which here would be in the case of the 2007 and 2008 events, that we needed him to stand to the side rather than right in the middle of an entry area where you have large numbers of people who are on Market Street entering into one – being filtered into one small area, and that's an area for entering. That's not an area for engaging in argument. That's not an area for whipping people up. That's an area where they can go in. And yet Mr. Markavich was still permitted to stand to the side and make his point. And that's what Starzl – that's how Starzl says to focus upon content neutrality. Starzl says – he made essentially the same point in Starzl by saying there was a heckler's veto there because we acted to restrict him out of concern about the crowd's reaction to his message. And this court in Starzl said the more germane question isn't are we acting because we're afraid of an anticipated reaction. The more germane question is was it apparent to us – did we act because of disagreement with his speech? And where it's apparent that we acted and had respect and understanding that he had a First Amendment right to speak, you can't draw that conclusion, and I would submit that that's the case here where all we did was say stand to the side, don't stand at the entry point. And if you look at Markavich v. City of Chicago, it was essentially the same result, and in that case the court felt that it was able to grant summary judgment. And I also just wanted to point out that in the Liberty Bell case, the court made a similar comment when it was discussing whether it could draw a conclusion that the – whether it could call into question content neutrality. And it said – it specifically said in that case where they had told him to move away from a sidewalk adjacent to the Liberty Bell rather than continue to stand there, because they had told him to move all the way away from the area, they had a problem. And the court said if they had merely told him to move a short ways down the block on 6th Street, maybe we could still draw the conclusion that they were acting for their stated reasons about congestion, concern about ingress and egress, and protection. And I would submit that that's exactly what we did here. We just told him to stand a short ways down the block. We didn't tell him to leave the area. We didn't impose other types of restriction upon his communication. We allowed him to make his point to his intended audience. Mr. Carte was correct in saying it wasn't content – it wasn't a content situation because he was opposing the position of the people that had the parade, as I understand the opinion. I'm sorry, Your Honor. Mr. Carte said this was not content-based because he – as I understand, because he was opposed to the message of the parade. Is that correct? Is that an appropriate analysis? Yes, absolutely. And I would invite the court's attention to a case like Startle where the court said – and cases like Kroll out of the D.C. Circuit where the court says, just because we have to take cognizance of the content of your speech, as long as there's evidence that we're acting for reasons that are not related to your speech, such as concern about ingress and egress, such as concern about maintaining safety and order. And according to Startle, this is particularly the case at a large permitted event like these events, that you can draw the conclusion that we were acting in a content-neutral manner. And I also just wanted to jump to the Prop 8 event for a moment because there was some discussion about Judge Berry relying upon the police reports and whether there was a disputed issue of fact there. And in his reply brief, Mr. Hoppe complained that I was relying upon Captain Fisher's affidavit and I can't do that on summary judgment. And I just wanted to point out what I rely upon is the deposition testimony of Mr. Markavich. And that's why we're entitled to summary judgment on that claim even though there's no tape. According to the undisputed deposition testimony of Mr. Markavich, he was at an event that contained thousands of gay rights supporters. He drew a crowd, a nearby crowd of hundreds of those supporters who were agitated by his message of opposition to gay marriage. And at that point, the officers didn't force him totally out of the area. They forced him, according to his own testimony, 40 feet away. And I would submit that under his own admitted statement of the facts, we had justification to act there, and we didn't act because of disagreement with his message. We acted in order to maintain order, and the need to maintain order there was obvious. Why would not the question of whether the motivation was the content of the speech as opposed to some other factor be a question for the jury to decide? In this case, Judge Van Aske, I think that you can look to, most importantly, the minimal nature of the restrictions because, again, the most germane question on a content neutrality analysis is whether we've acted out of disagreement with the speech, whether we've acted to squelch it or to shield the gay rights supporters from the message, which is what the court ruled could have happened in the Liberty Bell case, which is why they ruled it was inappropriate to impose criminal convictions. Whereas in this case, you can't draw that conclusion where we just told him to stand over here, not there, and actually for large portions of all of these festivals, he was allowed to convey his message freely. You invoke the city's policy that you can restrict him as long as he's within sight and sound of his audience, right? Yes, Your Honor, and I believe that Mark Havish v. City of Chicago echoes that where it talks in its discussion about ample alternative channels where it says, you have an ample alternative channel if you're able to reach your intended audience and if you're within, quote, view and earshot, end quote, of your intended audience, and that was the case. In the settlement agreement, you changed within view and earshot to sight and sound. I'm speaking about the Mark Havish v. City of Chicago, the 7th Circuit case. Because the settlement agreement speaks of sight and sound. I'm sorry? The policy uses the phrase sight and sound. Yes, that's the standard Captain Fisher uses. In other words, I want him, as Starzl expresses and as the Chicago case expresses, Captain Fisher uses the same standard. I want to be able to make sure that you're reaching your intended audience. That's what a sight and sound standard is. I want to make sure they can see you. I want to make sure they can hear you, and that was certainly the case here. I'm wondering, since I don't have much time left, is the court interested in hearing argument on the Fourth Amendment claim? I don't think it is. Would you like argument on the Fourth Amendment issue? No. No. I think we're fine. Okay. I also just wanted to point out a couple of ancillary issues that should the court have an issue with the court. Affirming the summary judgment grant, that we did have two alternative grounds, that we did have the qualified immunity argument, and even if the court concludes that there's not enough here to support the grant of summary judgment on the merits claim, surely there's enough evidence here to say that we made a good faith effort here to balance the need for safety in order with Mr. Markavich's ability to express himself at all of these events. And I also just wanted to remind the court that the city has an alternative claim, has an alternative ground for affirmance on the municipal liability issues, that even if the court determines that there wasn't enough to grant the individual summary judgment here, that there was enough to grant the city summary judgment on the issue of municipal liability. All right. Thank you. Thank you. If there are no further questions, I'll rest on my briefs. Thank you. Thank you very much. Your Honor, as I started out saying, this case presents the opportunity for the court to affirm the well-established right of individuals to engage in unpopular speech in the public fora. Mr. Markavich has been accused of claiming a right to unfettered speech on the public streets at sidewalks. Those words have never passed his mouth, nor an attorney who's argued for him. I don't know where that idea came from. What Mr. Markavich does claim is a right to be able to engage in free speech on the public streets and sidewalks in the public square without unlawful restrictions placed on him and without being singled out because of the content or viewpoint of the message. Is the unlawful restriction here that he had to engage in his communications no more than 40 feet from where he wanted to be? Your Honor, the unlawful restriction, Your Honor, occurs when Mr. Markavich is singled out for restrictions that aren't imposed on anybody else because of the content and viewpoint of his speech. Counsel mentioned the Markavich v. Chicago case. Again, when you look at that opinion, the court mentioned the fact that the reason the police acted was not because of the content of Mr. Markavich's speech, but because of the conduct that they found in his group impeding traffic and nothing to do with anything else. Same thing with Startsell. The focus of the court in that case was not an analysis of whether the action was taken because of the content of his message. The court never got to that issue because it found that the police acted out of the context in response to Mr. Markavich's conduct that the court found there. Your Honors, again, I come back to the fact that this case is governed by a strict scrutiny standard. That's a standard that was not imposed on the government by the court. And I completely agree with Ms. Isman that this court should look at the videos of these events. And when you look at the videos of the Pride Fest events, it clearly shows that there was no impeding of traffic. He was on a bridge that's two sidewalks and two lanes of traffic wide. There's nothing in the evidence to establish there was even a threat of impeding of traffic. It also shows that there's no evidence of any concern of a crowd getting out of control. And what this court held in the U.S. v. Markavich case said is that the government can't simply rely on a mantra and just repeat, we have to impose restrictions because we're concerned about traffic being impeded. We're concerned about public safety. We have to protect the speaker. Then free speech doesn't mean anything. This court held in U.S. v. Markavich that there has to be something more. It can't be a hypothetical concern. It has to be a real concern. And I submit to your honors that if this court applies a strict scrutiny standard that the city will not meet that burden. And we request that the decision of the trial court be reversed. Thank you, your honors. Roberts. Roberts. We'll take the matter under advisement. Well argued. Thank you.